UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSE CORPORATION </br></br> Plaintiff, </br></br> v. </br></br> SALMAN EJAZ </br></br> Defendant. | ) </br> ) </br> ) </br> ) Case No. 11-cv-10629-DJC </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

**BOSE CORPORATION'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Bose Corporation ("Bose") respectfully submits this memorandum of law in support of its motion for summary judgment.

**INTRODUCTION**

In 2006, Bose filed a lawsuit against defendant Salman Ejaz ("Ejaz") in the United Kingdom's High Court of Justice. To resolve this lawsuit, the parties entered into a settlement agreement whereby Bose agreed to release all claims it had against Ejaz in exchange for, *inter alia*, an agreement that he would no longer sell Bose products either domestically or abroad. Contemporaneous with the signing of the settlement agreement in the United States, a Consent Order was entered in the United Kingdom's High Court of Justice ordering Ejaz to no longer sell Bose products in the European Union.

Upon the discovery of Ejaz's breach of the agreement through his continued sale of Bose products in the United States, Europe and Australia, Bose has brought this lawsuit against Ejaz asserting two theories of liability. First, Bose brings a cause of action for breach of the settlement agreement. Liability on this issue is not in dispute as Ejaz's answer to the complaint

admits that he sold Bose products after he signed the settlement agreement prohibiting the same. Bose seeks to enforce the liquidated damages clause of the settlement agreement due to Ejaz's admitted breach. Second, Bose asserts that in purchasing Bose products intended for resale in the United States and selling them in Australia as new products, Ejaz has infringed upon Bose's trademarks. Bose, in this motion, seeks injunctive relief against Ejaz as a result of this infringement.

## FACTS

Bose's Trademark Registrations

Bose has registered the following trademarks with the United States Patent and Trademark Office:

| Reg. No. | Reg. Date | Mark |
| --- | --- | --- |
| 991,271 | 8/20/1974 | BOSE |
| 1,727,482 | 10/27/1992 | BOSE |
| 1,738,278 | 12/8/1992 | BOSE |
| 1,828,700 | 3/29/1994 | BOSE |
| 1,830,727 | 4/12/1994 | BOSE |
| 2,288,004 | 10/19/1999 | BOSE |
| 1,622,251 | 11/13/1990 | LIFESTYLE |

These trademarks are famous and in full force and effect. Statement of Material Facts, paragraph 3 (hereinafter "SOF ¶_").

Ejaz's Actions

As early as 2005, Ejaz sold Bose products through eBay accounts named *rally959*, *global_impotz*, *clark_simpson* and *globalexportss*. SOF ¶5. In 2006, a dispute between Ejaz and Bose arose due to Ejaz's sale into the European Union of Bose products intended for resale in the

United States. SOF ¶6. Due to differences between Bose products made for the United States and those made for resale in the United Kingdom, including differences in voltage and DVD region coding, Ejaz converted the Bose units he sold so that they would operate in the European Union. SOF ¶7.

In 2007, Bose and Ejaz ended their dispute through the execution of a formal settlement agreement (hereinafter, the "Agreement").[1] SOF ¶¶8,9. As part of the Agreement, Ejaz agreed to, *inter alia*, abstain from advertising, selling, offering for sale, distributing, shipping, altering, modifying, packaging, or in any way trading in items bearing a BOSE trademark either domestically or abroad without first obtaining the permission of Bose. SOF ¶10. Ejaz is well aware of the fact that "domestic" means within the United States, while "abroad" means outside the United States. SOF ¶11.

Shortly after executing the Agreement, Ejaz admittedly again began selling Bose products in the United States, Europe, and Australia via eBay and through his own webpage (universalelectronix.co.uk) without the permission of Bose. SOF ¶¶12, 13. The Bose products Ejaz sold into Australia were Bose products intended for resale in the United States. SOF ¶14.

In 2010, Ejaz's financial records demonstrate that he had assets of £1,041,908.00 and a yearly gross profit of £541,879.00. SOF ¶16. In 2011, Ejaz's financial records demonstrate that he had assets of £1,166,652.00 and a yearly gross profit of £582,492.00. SOF ¶17.

## STANDARD OF REVIEW

Summary Judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[A] fact is

---

[1] A Consent Order was also entered in the British High Court of Justice which ordered that Ejaz refrain from, *inter alia*, selling Bose products within the European Union. *See* SOF ¶ 20.

~Doc# 25187.1~

'material' only if it potentially affects the outcome of the suit and a dispute over it is 'genuine.'" *Intern'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 199-200 (1st Cir. 1996).  There are no issues of material fact and summary judgment should be granted if the opposing party's "evidence is merely colorable, or not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *see also Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997) ("conclusory allegations, improbable inferences, and unsupported conclusions will not suffice [to survive summary judgment.").  This Court should ignore bald assertions and mere speculation as well as allegations "which have been conclusively contradicted by concessions or otherwise." *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir. 1987).  For the reasons set forth herein, it is undisputed that Ejaz breached the Agreement with Bose and infringed upon Bose's trademarks by shipping Bose products intended for resale in the United States into Australia with full knowledge that the products would not work as intended in Australia.  As such, this Court should grant Bose summary judgment on all claims.

## ARGUMENT & AUTHORITIES

**I.    Breach of Settlement Agreement**

    A.    <u>Breach of the Agreement is Undisputed</u>

On January 27, 2007, Ejaz executed the Agreement.  SOF ¶8.  Section 2.3 of the Agreement states:

> Ejaz and his affiliates, agents, representatives, successors and assigns agree to abstain from engaging in manufacturing, advertising, selling, offering for sale, distributing, producing, shipping, altering, modifying, packaging or in any way trading in items bearing a BOSE trademark, copyright or any items confusingly similar thereto, either domestically (within the United States of America) or abroad, without first obtaining the express written consent of Bose for each sale type or class, which consent may be withheld by Bose, within Bose's sole discretion.

4

SOF ¶10.  Ejaz admits to selling Bose products in violation of this provision of the Agreement.  SOF ¶¶ 12, 13, 18.

After being served with this lawsuit, Ejaz drafted an email in which he admits to breaching the Agreement.  Ejaz's email states, "Yes I admit it is my mistake that i [sic] should have NEVER sold a single Bose product, but I was under the impression that they have barred me from selling Bose in the US and EU.  But now I have read the agreement that I signed, it clearly stated US and abroad."  SOF ¶18 (Ejaz Depo. Ex. 22, pg. 4.).  Ejaz goes on to write, "It is my fault and I guess greed got the better of me."  SOF ¶18 (Ejaz Depo. Ex. 22, pg. 3.).  Moreover, a simple review of his eBay auctions demonstrate that he sold Bose products in the United States, Europe, and Australia all after he executed the Agreement.  SOF ¶13.

It is undisputed that in the Agreement, Ejaz agreed to no longer sell Bose products.  It is undisputed that Ejaz continued to sell Bose products after executing the Agreement as "greed got the better of [him]."  Therefore, there are no facts in dispute and summary judgment should enter for Bose on the breach of settlement agreement claim.

   B. <u>Ejaz's Own Testimony Demonstrates that He Entered the Agreement Freely</u>

In his Answer, Ejaz has asserted duress as an affirmative defense in this case.  However, the undisputed evidence in this case proves this affirmative defense has no merit.

A party seeking to avoid an obligation based upon duress bears the burden of proving that "(1) he has been the victim of some unlawful or wrongful act or threat; (2) the act or threat deprived him of his free or unfettered will; and (3) due to the first two factors, he was compelled to make a disproportionate exchange of values." *Happ v. Corning, Inc.*, 466 F.3d 41, 44 (1st Cir. 2006).  Mere "commercial bargaining involve[ing] economic pressure 'absent an *improper* threat . . . is not duress.'" *Happ v. Corning, Inc.*, 466 F.3d 41, 44 (1st Cir. 2006) (*quoting* 7 J. Perillo,

5

*Corbin on Contracts* § 28.3, at 47 (rev'd ed.2002)). "Economic duress does not exist where one contracting party simply takes advantage of another's financial difficulty or necessity. Rather, it exists only if the alleged wrongdoer's acts can be shown to have *caused* the financial difficulty that it then takes advantage of." *Happ v. Corning Inc.*, 2005 WL 3704889 (D. Mass. Nov. 28, 2005) *aff'd sub nom. Happ v. Corning, Inc.,* 466 F.3d 41 (1st Cir. 2006). When, as here, the moving party does not bear the burden of proof, summary judgment may enter in its favor when it "merely demonstrates 'an absence of evidence to support the nonmoving party's case.'" *Boyd v. Camardo*, 65 F. App'x 326, 327 (1st Cir. 2003) (*quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The party who bears the burden must then "present definite, competent evidence to rebut the motion." *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 28 (1st Cir. 2011) (*quoting Martínez–Rodríguez v. Guevara,* 597 F.3d 414, 419 (1st Cir. 2010)). Thus, if Bose can merely demonstrate the lack of evidence with respect to one of the three required elements of duress, summary judgment may enter.

In this case, Ejaz has not, and cannot, point to *any* evidence that he has been (1) the victim of some unlawful act (2) that deprived him of his free will (3) which caused him to make a disproportionate exchange of values as required by *Happ*. Instead, as his own testimony makes clear, the Agreement was mailed and/or emailed to him, he reviewed it with his wife, and mailed it back to Bose the same day he received it as he and his wife were anxious to resolve the lawsuit. SOF ¶ 8. This is not a situation in which Ejaz was pressured or forced to sign the Agreement in a coercive or rushed environment. Instead, he received the Agreement via mail and/or email, reviewed it with his wife at his leisure, discussed the pros and cons of signing the Agreement with his wife, and chose to execute the Agreement and mail it back to Bose. Under

these circumstances, derived from Ejaz's own testimony, an affirmative defense of duress cannot exist.

Moreover, even assuming *arguendo* that phone conversations with Bose that occurred before the Agreement was sent to him could be the source of a duress defense, Ejaz's testimony as to the content of these conversations offers no such evidence. In fact, he testifies that Bose did not make any false statements to him at all. SOF ¶8. When questioned about the representations that Bose made to him in phone discussions prior to signing the Agreement, Ejaz testified as follows:

**Q:** Well, I'm just trying to focus on what specifically he told you. Did he make any representations to you that you believe were incorrect or untrue?

**Ejaz:** I'm not understanding your question. What are you saying? In relation to what he was talking to me were untrue or –

**Q:** Yes. Were there statements he made to you that you believe were not true?

**Ejaz:** Well, about the Bose, about selling Bose, that you cannot do, I did believe what he was saying is untrue.

**Q:** You believe he was incorrect about the law that he was telling you?

**Ejaz:** Correct.

**Q:** Anything other than that that you believe that he told you that was not true?

**Ejaz:** There will be repercussions. Like if you don't sign, you will have to face hefty fine, Bose will come after you. But I don't exactly remember the words. I'm telling you what I had in mind at that time what he was coming at me with. I don't know the exact words but that was the mindset that he made me believe with all the accusations. Him telling me that, you know, Bose is a big company, you know, they can do whatever they want. I'm not saying he might have said those exact words, but that was the implication behind or at least that's what I understood.

**Q:** And do you believe any of that is false?

**Ejaz:** No.

7

**Q:** I mean, the reason that you were worried is because you believed all that was true, is that correct?

**Ejaz:** Correct.

**Q:** And have you learned, through today, that any of that was not true?

**Ejaz:** No.

SOF Exhibit B, 44:6-45:24. As shown by his own testimony, Bose did not make any misrepresentations to Ejaz. Instead, Bose accurately relayed its position of the dispute and the potential outcomes of the dispute if it were to be fully litigated. There is simply no evidence of a threat that robbed Ejaz of his own free will. Moreover, the terms of the Agreement do not evidence a disproportionate exchange between the parties. At its core, the Agreement required Ejaz to stop his infringing conduct. Given his potential liability, the terms of the Agreement were wholly reasonable and offer no evidence that Ejaz "was compelled to make a disproportionate exchange of values" as required by *Happ*.

In short, Ejaz's own testimony demonstrates that the Agreement was not entered under duress. Instead, the maxim that "a fair compromise is often achieved when both parties are unhappy with the terms" was achieved. In this matter, Bose gave up its right to seek damages being caused by Ejaz's infringing sales, while Ejaz gave up his right to continue to sell Bose products. There is no evidence that Ejaz was under duress, rather the evidence shows that he was greedy and wanted to continue selling Bose products when he had already agreed not to. Without evidence that Ejaz was "the victim of some unlawful or wrongful act or threat; (2) the act or threat deprived him of his free or unfettered will; and (3) due to the first two factors, [Ejaz] was compelled to make a disproportionate exchange of values," *Happ* requires summary judgment to be entered in Bose's favor.

C.     The <u>Liquidated Damages Provision is Enforceable</u>

Section 5.1 of the Agreement provides a liquated damages provision. It allows Bose to seek liquidated damages of fifty-thousand dollars ($50,000) for each Bose product that Ejaz sells in violation of the Agreement. Bose seeks to enforce this provision due to Ejaz's admitted breach of the Agreement. In the email Ejaz sent after being served with the lawsuit, he admits that he has sold at least seven (7) Bose products in breach of the Agreement. SOF ¶18. Bose seeks to enforce the liquidated damages clause as to these seven sales.[2]

When "a contract provision . . . clearly and reasonably establishes liquidated damages[,] [it] should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty." *TAL Fin. Corp. v. CSC Consulting, Inc.,* 446 Mass. 422, 431 (2006). "Whether a liquidated damages provision in a contract is an unenforceable penalty is a question of law." *NPS, LLC v. Minihane,* 451 Mass. 417, 886 N.E.2d 670, 673 (2008); *see also Kunelius v. Town of Stow*, 588 F.3d 1, 13-14 (1st Cir. 2009) (*citing NPS, LLC*). The Court evaluates the clause using all information known "at the time the agreement was made." So long as the "potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach" the agreement is enforceable. *NRT New England, Inc. v. Moncure*, 78 Mass. App. Ct. 397, 400 (2010). "The burden of showing that a liquidated damages provision is unenforceable rests with the party challenging enforcement of

---

[2] Bose draws the Court's attention to the list of eBay auctions attached as Exhibit D to Bose's Statement of Facts. A quick review of these eBay postings demonstrates that Ejaz likely sold far more than only seven Bose products in violation of the Agreement. In fact, the list of auctions provided by Bose demonstrates that Ejaz advertised and sold twenty-eight (28) Bose products. Moreover, the emails produced in this case show that not all of Ejaz's sales took place over eBay. Ejaz was more than willing to sell Bose products through marketplaces other than eBay and even went so far as to set up an online store to accomplish the same. *See* Ejaz Depo, Exhibit 1. However, rather than shift the burden to Ejaz to show that he did not post or sell these items, Bose, for the purposes of this motion, relies on Ejaz's admission that he sold at least seven Bose products in violation of the Agreement.

9

the provision . . . ." *NPS, LLC,* 451 Mass. at 420 (*citing TAL Fin. Corp. v. CSC Consulting, Inc.,* 446 Mass. 422, 423 (2006)) *see also Honey Dew Assocs., Inc. v. M & K Food Corp.,* 241 F.3d 23, 27 (1st Cir.2001). When determining whether the liquidated damages were reasonable, Massachusetts courts do not "take a 'second look' at the actual damages after the contract has been breached." *NPS, LLC*, 451 Mass. at 420 (*quoting Kelly v. Marx,* 428 Mass. 877, 878, 705 N.E.2d 1114 (1999)). All "reasonable doubts [are resolved] in favor of the aggrieved party" – in this case, Bose. *See Cummings Props., LLC v. National Communications Corp.,* 449 Mass. 490, 494, 869 N.E.2d 617 (2007).

The best evidence that the $50,000.00 liquidated damages clause was a reasonable forecast of Bose's expectant damages comes from Ejaz's own initial disclosures. In Ejaz's initial disclosures, Ejaz claimed that the Asset Restraining Order issued in this case, in place for four weeks, caused him to lose an estimated $50,000.00 from the "lawful resale of Bose products." SOF ¶21. Thus, at the beginning of this case, with full knowledge of how many Bose products he was selling, Ejaz estimated that he was losing $50,000.00 ***in profits*** due to his inability to sell Bose products. SOF ¶21. Indeed, the Lanham Act specifically allows a plaintiff to recover a defendant's profits as a measure of the trademark holder's damages. *See* 15 U.S.C. 1117(a) ("the plaintiff shall be entitled… to recover (1) defendant's profits"). If Ejaz himself asserts through estimation that he is making $50,000.00 in profits from his sale of Bose products over a four week period, Ejaz cannot now argue that the $50,000.00 liquidated damages provision was not a reasonable forecast of damages Bose expected to incur in the event of Ejaz's breach of the Agreement.

Additionally, given Ejaz's sale of Bose products in both the United States and Europe, Bose knew Ejaz had a significant international business operation. Ejaz's financial records show

10

assets of £1,041,908.00 and a yearly gross profit of £541,879.00 in 2010 (SOF ¶16). Similarly, his financial records evidence assets of £1,166,652.00 and a yearly gross profit of £582,492.00 in 2011 (SOF ¶17). Give the large scale, international scope of his business, the liquidated damages clause was entirely appropriate.

Furthermore, at the time the present Agreement was made, the $50,000 liquidated damages clause was entirely reasonable given Bose's interactions and experiences with Ejaz. The Court need look no further than the emails Ejaz sent to Bose before the Agreement was executed. Attached as Exhibit 7 to Ejaz's deposition, is an email chain between Bose and Ejaz before the Agreement was executed. In the email exchange, Ejaz makes it clear that, given the online nature of his business, Bose would have trouble stopping him from selling Bose products if Ejaz chose to continue selling Bose products. "What is bose [sic] going to do about it? Nothing, they can't… When I will Please I WILL [sic] sell Bose, and I will welcome you to sue my phony address with ebay, the only way for you to catch me would be coming at the mailbox place to arrest me, from where I sell my units." SOF Exhibit 7 of Exhibit B. Concluding his email, Ejaz warns Bose that he could easily disrupt Bose's entire authorized dealer network and there would be nothing that Bose could do to stop it. Ejaz wrote:

> "I have another idea of selling Bose units, Make a new ID on ebay.co.uk for every bose sale, and put a bose auction and have them collect from ANY airport within UK of their choice. It costs me 300+ dollars to ship one lifestyle my cost on one Lifestyle 48 is $2,800 dollars, I sell them in UK for at least 3200 pounds. ( still cheaper than 400 quid of bose retail price ) 3200 translates into roughly $5995. It would actually cost me cheaper to get a $250 ticket from www.ba.com ( British air) or Virgin Atlantic, to fly down to ANY airport in UK and hand over that unit in person. My profit if you ask me ? Only $2200. Is it doable ? Yes, Because i have done it many times. Will I do it ? Whenever I have time. Cheers." [sic]

*Id*. Ejaz made it clear that there was little Bose could do to stop his infringing activities or even identify that it was Ejaz that was causing the harm. Ejaz threatened to hide behind the

11

anonymous nature of his online sales. Moreover, Bose has presented evidence that told Bose that he would evade them and leave the country if Bose ever tried to come after him. Ejaz Depo 42:3-15. These overt threats to Bose demonstrate that the liquidated damage clause is a reasonable forecast of Bose's damages as Ejaz made it clear that finding him and detecting his nefarious activities would be extremely difficult and costly. In fact, the evidence shows that Ejaz carried out exactly this threatened plan. Exhibit 11 of Ejaz's deposition is an email chain between Ejaz and a customer in which Ejaz offers to meet the customer in an airport to sell him a Bose product (in 2008, a year after he signed the Agreement).

Given that trademark "damages are difficult or impossible to estimate," Courts have consistently held liquidated damages provisions are valid and enforceable in trademark infringement matters. *Marvel Entm't, Inc. v. Kellytoy (USA), Inc.,* 769 F. Supp. 2d 520, 527 (S.D.N.Y. 2011) (citing cases); *see, also Winkler v. Asmar & Sons, Inc.*, 2005 WL 2173700 (E.D. Mich. Sept. 7, 2005) (Court entered order allowing $50,000 in liquidated damages for all future trademark infringements). Moreover, Congress too recognizes the difficulty in putting a number value on the damage done to a trademark as can be seen from the statutory damage provisions of the Lanham Act. The Lanham Act allows statutory damages of up to $2,000,000.00 for infringement of non-genuine or counterfeit goods. *See* 15 U.S.C. §1117(c).

Bose spends millions of dollars a year promoting its most valuable asset – the BOSE name. SOF ¶19. Ejaz's actions threatened the goodwill Bose had spent significant resources developing. In 2006, before signing the Agreement, Ejaz admits that he converted US-made 110V US Bose products into 240V Bose products by altering the product with a power converter (Ejaz Depo. 132:8-20). However, he was less than forthcoming with his customers about whether the product was a genuine product intended for sale in the Europe. As shown on page 5

of Exhibit 10 of Ejaz's deposition (SOF, Exhibit B), Ejaz received the following questions for a customer, "hi are the units actually uk stock or are they just shipped with uk power supply units?" Ejaz, responded by writing, "Units are IN UK and will only work IN UK with ORIGINAL UK power Supply.  PLEASE LOOK AT THE PICTURES."  As all products he sold in 2006 were converted US products to which he added UK power converters, this statement was patently false.  Thus, when this customer, or any Ejaz customer, purchased what they believed to be a genuine Bose product, they received a US Bose product with an after-market power converter.  Customers look unfavorably upon the BOSE mark when they receive a product that has been converted.  *See* Exhibit 12 the of Ejaz Deposition which is an email from a Bose customer to Ejaz claiming that Ejaz "ripped [him] off with an imported u.s. unit."

    Bose has produced evidence that Ejaz himself estimates that lost profits from his inability to sell Bose products was $50,000.00.  Similarly, at the time the Agreement was executed, Ejaz had made it clear that (1) Bose could not stop his online sales due to the false address he provided eBay, (2) he could open a new account for each sale and simply meet customers at the airport, (3) he would leave the country if Bose ever tried to collect money from him, and (4) he was damaging the BOSE mark by selling inferior 110V products into the European market leaving customers who purchased a Bose product feeling "ripped off."  Bose has produced evidence that it spends millions of dollars every year promoting and advertising the BOSE mark that was (and continues to be) damaged by Ejaz's illicit sales.  Moreover, given the past nefarious encounters with Ejaz, the anonymous nature of an internet seller, and Ejaz's proclivity for literally opening up accounts all over the world, it was unlikely that Bose would ever be able to prove the amount of Bose products sold and that Bose would incur a high cost in attempting to "catch" Ejaz should he ever breach the Agreement.  Furthermore, Bose has provided a case in

which a judge ordered a liquidated damages clause of $50,000.00 to be upheld involving a mark far less famous than Bose (*Winkler v. Asmar & Sons, Inc.*), has shown that Congress allows statutory damages of up to $2,000,000 per infringement, and has provided case law in which Courts recognize the difficulties in providing estimations of trademark damages incurred.  Truth be told, it was impossible for Bose to forecast with precision the damages that Ejaz's continued infringement would cause given the viral nature of the internet, Ejaz's lack of accurate sales records, and the inherent difficulties of estimating trademark damages.  As such, the liquidated damages provision, which both parties agreed upon, was necessary.  Moreover, given the specific facts of this case and the uncertainty of trademark infringement damages, the $50,000 liquidated damages clause was a reasonable forecast of damages the parties expected Bose to incur in the event of a breach.

As the enforceability of a liquidated damages provision is a question of law, for the reasons stated *supra*, this Court should hold this provision to be enforceable and award of liquated damages of $50,000.00 for each of these seven admitted sales of Bose products in violation of the Agreement.

**II.     Trademark Infringement**

The dual purpose of trademark law is to protect both the consuming public and trademark holders.   First, the Act focuses on protecting consumers from confusion, because "[e]very product is composed of a bundle of special characteristics," and the consumer, in purchasing that product, "expects to receive those special characteristics on every occasion." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 636 (1st Cir.1992); *see also Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 619 (9th Cir.1993) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 112 S.Ct. 2753, 2764 n. 15, (1992)) (purpose of trademark protection is to ensure

14

that the public "will get the product which it asks for and wants to get").  "Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. This is the well-established rule of law protecting both the public and the trade-mark owner." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 112 S.Ct. at n. 15, *citing* S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946). In this matter, Ejaz's conduct harms both Bose and the consuming public and frustrates the dual purposes of trademark law.

Bose manufactures home theatre systems for resale around the world.  However, a home theatre system manufactured for resale in the United States will be materially different from a home theater system manufactured for resale in other parts of the world, including Australia.  *See* Verified Complaint ¶¶9-13 (Docket No.10).  There are obvious differences in products intended for resale in the United States and those intended for resale in Australia.  Differences such as electrical voltage systems (United States is 110V, while Australia is 240V) and DVD region coding (United States is region 1, while Australia is Region 4) are all readily apparent and easy to recognize.  SOF ¶15.  However, there are also subtle differences that affect the way that electronics perform, as well.  Differences between U.S. and Australian remote controls, product warranties, radio tuners, and differences in FM de-emphasis can all drastically affect the performance of home theatre systems and are nuanced enough that a casual consumer may not even know they exist.  SOF ¶15.  Due to these differences, a Bose home theatre system intended for resale in the United States will not operate optimally in Australia.  SOF ¶15.

To succeed on the merits of its trademark infringement claim, Bose must show that its trademarks are "entitled to trademark protection and that the allegedly infringing use is likely to cause consumer confusion." *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 12

(1st Cir.2008).  "[T]he touchstone of liability is the same" for trademark infringement claims under federal law, dilution, and state trademark infringement, "namely, a likelihood of consumer confusion as to the source of the goods."  *Montblanc-Simplo GmbH v. Staples, Inc.,* 172 F. Supp. 2d 231, 235 *injunction vacated by agreement*, *Montblanc-Simplo Gmbh v. Staples, Inc.*, 175 F. Supp. 2d 95 (D. Mass. 2001).  The First Circuit holds that "a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law."  *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992).  "[P]rotection kicks in under the Lanham Act where two merchants sell physically different products in the same market and under the same name, for it is this prototype that impinges on a trademark holder's goodwill and threatens to deceive consumers." *Nestle,* 982 F.2d at 637 (citation omitted).  Therefore, the test for infringement essentially boils down to a determination as to whether "material differences" exist between the two products bearing the same mark being sold in the same marketplace.

In *Bose Corp. v. Silonsonnic Corp*, the Federal District Court of Southern New York analyzed whether material differences existed on facts nearly identical to those before this Court. *See Bose Corp. v. Silonsonnic Corp*, 413 F.Supp.2d 339 (S.D.N.Y. 2006).  In *Silonsonnic*, the defendant, much like Ejaz, was altering the voltage and region coding of Bose Lifestyle home theatre systems intended for resale in the United States and then shipping the product into the European Union.  In granting the preliminary injunction and finding a likelihood of success of the merits, the Court stated,

> "Bose has a legitimate interest in keeping inferior goods passed off as optimal performing Bose products out of the European market; doing so insures that the value of Bose's highly respected trademarks are not diluted or damaged.  One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's mark.

y

> ...
> Defendants' sales of the American-market [Bose Products] to [foreign] market[s]… apparently provide a sub-optimal audio/visual experience to [foreign] consumers, the strength of Bose's trademark in Europe is damaged by Defendants' practices."

*Id.* at 343, 345. The *Silonsonnic* Court recognized that Bose home theatres systems intended for resale in the United States were materially different than Bose systems intended for resale in Europe. As such, a Bose customer seeking a European made home theatre system received a different product than she thought she was receiving. Because the product bought was different than the product the customer thought she was receiving, the customer had been deceived – an act trademark law aims to prevent. Similarly, when that product does not play a DVD because the region coding is incorrect or does not work because the voltage is different, that same customer is likely to blame Bose for the faulty product and think less of the BOSE mark. Again, trademark law aims to allow Bose to shape the contours of its reputation and prevent this type of customer experience. The facts of the *Silonsonnic* decision are identical to the current motion before this Court in all material respects, save for the fact that Ejaz is shipping product to Australia rather than to the European Union. An Australian customer buying from Ejaz believes that they are getting a Bose product intended for resale in Australia, not a Bose product intended for resale in the United States that Ejaz may or may not have altered. As such, this Court should follow the reasoning of the *Silonsonnic* decision and grant Bose's motion for summary judgment on Bose's trademark claim.

Moreover, the First Circuit case of *Nestle* provides further support for Bose's motion. In *Nestle*, the First Circuit discussed when a difference is "material" and therefore infringing. "A 'material' difference [is defined] broadly to encompass 'any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be

relevant when purchasing a product.'" *Montblanc-Simplo GmbH* 172 F. Supp. 2d at 237 (*quoting Nestle*, 982 F.2d at 641). The First Circuit explained, as "subtle differences" in products most easily confuse consumers, courts keep the "threshold of materiality . . . low enough to take account of potentially confusing differences—differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations." *Nestle*, 982 F.2d at 641.

The differences between Bose products intended for the United States and those intended for sale in Australia easily meet the low materiality threshold set forth in *Nestle*. Bose has provided evidence that there are differences in DVD region coding, differences in the voltage, differences in the language capabilities of the remote controls, differences in product warranty, differences in the radio tuner, and differences in FM de-emphasis. SOF ¶15. Due to these differences, a Bose product manufactured for resale in the United States will not perform optimally in Australia. SOF ¶15. Moreover, Bose has presented evidence of an actual customer of Ejaz's who received a Bose product intended for resale in the United States rather than one intended for resale in Australia. *See* SOF Exhibit 12 of Exhibit B. The customer's email to Ejaz reads, "I need a uk power supply from you , the 110v unit is unsuitable , and cant be connected, i think you have ripped me off with an imported u.s. unit , you are still listing the unit that i should have, you need to sort this out before i take this further!!" *Id*.

Bose has presented evidence that Ejaz sells to consumers in Australia Bose products that are intended for resale in the United States. As the Bose products sold by Ejaz in Australia are materially different than those sold by Bose in Australia, customers do not receive the product they intended to purchase and Bose is harmed when the customer's Bose products do not perform as they should in Australia. The aim of the Lanham Act is to prevent both of these results. As

there are no genuine issues of material fact in dispute, summary judgment should enter in Bose's favor on its trademark claims.

### III. Conclusion

WHEREFORE, as a result of his admitted breach of the Agreement, Bose requests summary judgment and an award of $350,000.00 be entered in its favor on its claim for breach of the Agreement. The $350,000.00 represents a liquidated damage award of $50,000.00 for each of the seven (7) Bose products Ejaz admits to selling in violation of the agreement.[3] Similarly, Bose requests that summary judgment be entered in its favor on all trademark claims and that the Court enter an order requiring Ejaz to follow the terms of the Agreement and for any other such relief that this Court deems just and proper under the circumstances.

                                                                Respectfully submitted,

                                                                Plaintiff,
                                                                BOSE CORPORATION,
                                                                by its attorney,

*/s/ Morgan T. Nickerson*
Morgan T. Nickerson (BBO # 667290)
morgan.nickerson@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Post Office Sq., 30th Floor
Boston, MA 02109
p.    (617) 573-4700
f.    (617) 573-4710

Dated: February 21, 2012

---

[3] See Footnote 2 *supra*.

~Doc# 25187.1~

**CERTIFICATE OF SERVICE**

I, Morgan T. Nickerson, hereby certify that this document has been filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: February 21, 2012         */s/ Morgan T. Nickerson*
                                Morgan T. Nickerson

~Doc# 25187.1~