**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| **BOSE CORPORATION,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 11-10629-DJC** |
| ) | |
| **SALMAN EJAZ,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM AND ORDER**

**Casper, J.**                                                                                      September 13, 2012

**I.      Introduction**

Plaintiff Bose Corporation ("Bose") designs, manufactures and sells a variety of high-performance audio products, including home theater products. Defendant Salman Ejaz ("Ejaz") buys electronics, including Bose products, and resells them on the auction website eBay.com ("eBay"). Bose brought this action against Ejaz alleging that Ejaz had been using eBay to sell products designed by Bose for use in the United States in Australia and claiming that, in so doing, Ejaz violated the parties' settlement agreement and committed trademark infringement. Before the Court is Bose's motion for summary judgment. For the reasons set forth below, Bose's motion for summary judgment is GRANTED as to Counts I and II and DENIED as to Count III.

**II.     Burden of Proof and Standard of Review**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and

the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." Bos. Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 1989) (quoting Kazmaier v. Wooten, 761 F.2d 46, 48–49 (1st Cir. 1985)) (internal quotation marks omitted). The moving party must show the basis for its motion and demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); see Celotex Corp., 477 U.S. at 323. "[A] fact is 'material' only if it potentially affects the outcome of the suit and a dispute over it is 'genuine.'" Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199–200 (1st Cir. 1996) (internal citation omitted). The nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

## III.    Factual Background

Bose designs, manufactures and sells a variety of high-performance audio products, including home theater systems, under the BOSE® and LIFESTYLE® federally registered trademarks. Bose's Statement of Undisputed Material Facts ("Pl. SOF"), D. 38 at ¶¶ 1, 3; Def.'s Resp. to Pl. SOF ("Def. SOF"), D. 43-1 at ¶¶ 1, 3. Bose sells products directly to consumers and through its retail stores and authorized resellers. Pl. SOF, D. 38 at ¶ 1; Ejaz SOF, D. 43-1 at ¶ 1.

Ejaz sells electronics, including Bose products, on eBay. Answer, D. 19 at ¶ 7; Ejaz Dep., D 38-2 at 26:18–23; 57:12–16. In 2006, a dispute arose between Ejaz and Bose about Ejaz's sale of Bose products to consumers in the European Union intended for resale in the United States. Ejaz Dep., D. 38-2 at 33:23–37:21, 38:5–17.

In 2007, Bose and Ejaz resolved their dispute through the execution of a Release and Settlement Agreement (the "Settlement Agreement"). D. 38-2 at 58; Ejaz Dep., D. 38-2 at 42:16–19. Ejaz testified at his deposition that he received the Settlement Agreement, signed it and returned it to Bose. Ejaz Dep., D. 38-2 at 74:18–75:19, 76:17–21. Section 2.3 of the Settlement Agreement states:

> Ejaz . . . agree[s] to abstain from engaging in manufacturing, advertising, selling, offering for sale, distributing, producing, shipping, altering, modifying, packaging or in any way trading in items bearing a BOSE trademark, copyright or any items confusingly similar thereto, either domestically (within the United States of America) or abroad, without first obtaining the express written consent of Bose for each sale type or class, which consent may be withheld by Bose, within Bose's sole discretion.

D. 38-2 at 60. Pursuant to the Settlement Agreement, Ejaz agreed to a consent order in the Chancery Division of the High Court of Justice of the Courts of England and Wales (the "Consent Order"), which was entered on March 9, 2007. D. 38-2 at 62; Consent Order, D. 38-2 at 67. The Consent Order ordered Ejaz not to sell Bose products in the European Union or infringe Bose's trademarks registered in the United Kingdom. Consent Order, D. 38-2 at 67–68. The Settlement Agreement also contains a liquidated damages provision that states:

> Should Ejaz . . . ever engage in the unauthorized use of Bose products, including but not limited to . . . selling, offering for sale, distributing . . . an item bearing a Bose trademark, copyright and/or patent . . . either domestically or abroad . . . Ejaz agrees to pay or cause to be paid to Bose fifty thousand United States dollars ($50,000) for each product in each instance of unauthorized use, and/or each instance of non-compliance.

D. 38-2 at 63.

However, after executing the Settlement Agreement, Ejaz sold Bose products in Australia via eBay. Def. SOF, D. 43-1 at ¶ 13. Ejaz does not dispute that he sold Bose products in violation of the Settlement Agreement. Def. SOF, D. 43-1 at ¶¶ 12-13, 18. In fact, on April 9, 2011, Ejaz wrote in an email to the owner of a website called tabberone.com that he sold seven Bose Lifestyle Systems in Australia since 2007. Ejaz Dep. Ex. 22, D. 38-2 at 156–157. Ejaz did not obtain consent from Bose to sell these systems. Ejaz Dep., D. 38-2 at 65:17–66:2. The Bose Lifestyle Systems Ejaz sold in Australia were purchased in the United States and were intended for resale only in the U.S. market. Id. at 52:10–53:5; 57:12–62:17, 146:19–22; 155:10–13. Bose Lifestyle Systems intended for resale in the United States are different from those intended for resale in Australia. Bose Dep., D. 38-6 at 87:23–88:10. There are differences in the DVD region coding between the United States and Australia. Answer, D. 19 at ¶ 10. There are also differences in the voltage, the language capabilities of the remote controls, product warranty and radio tuner. Bose Dep., D. 38-6 at 117:5–8; 88:17–89:5; 93:21–94:4; 116:21–117:4; 119:7–22.

IV. **Procedural History**

Bose filed its initial complaint against Ejaz on March 30, 2011 in Middlesex Superior Court. D. 1-1. Ejaz removed the case to this Court on April 13, 2011. D. 1. On August 3, 2011, Bose filed a Second Amended Complaint, the operative complaint in this action, alleging breach of the Settlement Agreement (Count I), violation of Bose's common law and federal trademark rights (Count II) and unlawful dilution of Bose's marks pursuant to 15 U.S.C. § 1125(c) (Count III). D. 17. Bose has now moved for summary judgment on all Counts. D. 36. After a hearing on Bose's motion for summary judgment on May 31, 2012, the Court took the matter under advisement.

## V.       Discussion

### A.       Breach of the Settlement Agreement (Count I)

Bose argues that Ejaz breached the Settlement Agreement.  Disputes under the Settlement Agreement are governed by Massachusetts law.  D. 38-2 at 65.  "Under Massachusetts law, a plaintiff alleging a breach of contract must show that:  (1) the parties entered into a [valid] contract; (2) the plaintiff was ready, willing, and able to perform under that contract; (3) the defendant breached that contract; and (4) the plaintiff sustained damages because of that breach."  Children's Hosp. Corp. v. George Washington Univ., 750 F. Supp. 2d 239, 245 (D. Mass. 2010).

The only element that Ejaz disputes is whether the parties entered into a valid contract.  His arguments in this regard, however, are unavailing.  First, Ejaz argues that the Settlement Agreement is not a valid contract because it is not supported by adequate consideration.  Specifically, he argues that the Settlement Agreement's release of all claims against Ejaz is "illusory" because Ejaz and Bose had already settled their dispute through a Consent Order with the British Court.  Def. Opp., D. 43 at 8.  Ejaz misreads the Settlement Agreement, which refers to all claims with no geographical limitations, D. 38-2 at 63, and misapprehends the nature of the Consent Order, which is not a freestanding agreement, but an element of the Settlement Agreement's performance that is explicitly agreed to in the Settlement Agreement.  Id. at 62.  The Settlement Agreement itself states in the preamble that the promises exchanged between Bose and Ejaz constituted adequate consideration: "in consideration of the recitals set forth above and the promises and covenants contained in this Agreement[], and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each party and for purposes of settlement only, the Parties agree as follows . . ." Id. at 58–59.  The parties agree to "waive, fully release, and forever discharge each other . . . from

5

any and all known claims or causes of action in connection with the Claims, from the beginning of the World to the date of this Agreement." Id. at 63. An agreement to settle preexisting claims is an enforceable contract supported by consideration. See Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co., 801 F.2d 536, 542 (1st Cir. 1986); Peters v. Wallach, 366 Mass. 622, 628 (1975). Therefore, the Settlement Agreement is supported by adequate consideration.

Second, Ejaz argues that the Settlement Agreement is unenforceable because there was no "meeting of the minds," and claims that he did not "knowingly agree[] to a broader prohibition on sales than that set forth in the United Kingdom consent order." Def. Opp., D. 43 at 8. Under Massachusetts law, "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). "In the absence of fraud, a person who signs a written agreement is bound by its terms whether [he] reads and understands them or not." DeLuca v. Bear Stearns & Co., 175 F. Supp. 2d 102, 115 (D. Mass. 2001). Ejaz testified at his deposition that he reviewed and signed the Settlement Agreement, Ejaz Dep., D. 38-2 at 74:18–75:19, 76:17–21, which states that "the Parties have agreed to the terms and conditions set forth" therein. D. 38-2 at 58. Ejaz attempts to create a dispute of material fact on this point by stating in his response to Bose's statement of material facts that he "disputes that he had the entire [Settlement] [A]greement in his possession or agreed to the terms enclosed in that document at the time he signed [the signature] page." Def. SOF, D. 43-1 at ¶ 9. However, he points to no evidence in the record and thus this position fails to show that the parties did not reach a meeting of the minds at the time that he entered into the Settlement Agreement.

Third, Ejaz argues that the Settlement Agreement is unenforceable because it is unconscionable. Def. Opp., D. 43 at 13. "Under Massachusetts law, an unconscionable contract is one 'such as no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other.'" Storie v. Household Int'l, Inc., No. 03-40268-FDS, 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005). Ejaz bears the burden to prove that the Settlement Agreement is unconscionable, In re Lowell, 20 B.R. 464, 467 (Bankr. D. Mass. 1982), and "must show both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." Storie, 2005 WL 3728718, at *9 (noting that "[t]he test is a conjunctive one"). Ejaz fails to establish either of these elements or to identify any disputed fact material to unconscionability. First, Ejaz cannot show substantive unconscionability because the terms of the contract were not one-sided, but rather mutually beneficial. Ejaz escaped potential legal liability and Bose stopped sales that allegedly infringed its trademark. D. 38-2 at 60, 63. Even Ejaz testified that he signed the Settlement Agreement because he and his wife were "anxious" to resolve the dispute because they did not want a lawsuit hanging over their heads, Ejaz Dep., D. 38-2 at 78:23–79:13; this is a far cry from substantive unconscionability. See Piantes v. Pepperidge Farm, Inc., 875 F. Supp. 929, 936 (D. Mass. 1995) (noting that "[t]he contract may . . . be substantively unfair if its terms are 'oppressive,' such as if there is a 'gross disparity of consideration'" (internal citation omitted) (quoting Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 294–95 (1980); Waters v. Min Ltd., 412 Mass. 64, 68 (1992))). Second, Ejaz fails to show that he "had no meaningful choice and was subject to unfair surprise." The terms of the contract are clear and are not "obscurely worded" or "buried in fine print in the

7

contract." See Storie, 2005 WL 3728718, at *9. In fact, Ejaz wrote in an email on April 9, 2011 that the Settlement Agreement "clearly stated" that he was prohibited from selling Bose products in the United States and abroad. Ejaz Dep. Ex. 22, D. 38-2 at 157. And, as discussed below with regard to Ejaz's claim of duress, Bose's conduct in negotiating the Settlement Agreement with him did not deprive Ejaz of his free will. For all of these reasons, Ejaz's unconscionability argument must fail.

Finally, Ejaz argues that the Settlement Agreement is unenforeceable on the ground of duress. Under Massachusetts law, "a party claiming to have entered into a contract under duress has the burden of showing that (1) he has been the victim of some unlawful or wrongful act or threat; (2) the act or threat deprived him of his free or unfettered will; and (3) due to the first two factors, he was compelled to make a disproportionate exchange of values." Happ v. Corning, Inc., 466 F.3d 41, 44 (1st Cir. 2006). Ejaz contends that he was under duress when he signed the Settlement Agreement because Bose's lawyers threatened him with imprisonment if he did not sign the agreement, and improperly advised him to sign the agreement when he was unrepresented by counsel (which he could not afford). Def. Opp., D. 43 at 15–16. He also describes his conversations with Bose's counsel as "very pressurizing, very intimidating." Ejaz Dep., D. 38-2 at 43:10–12.

Ejaz has failed to establish the requisite elements of duress. To begin with, there is no evidence in the record that anyone threatened Ejaz with imprisonment. Rather, when Ejaz was asked whether Bose's lawyer had said to him "you can go to jail," Ejaz testified: "He might have said along the lines that people do end up going to jail but I don't remember him exactly saying that, but behind the words that was the implication. Or at least I felt . . . that way." Id. at 47:16–22. Thus, the record establishes at most that Ejaz subjectively feared that he could be imprisoned, which is insufficient to establish duress. See Am. Mgmt. Servs., Inc. v. Nygren, Nos. 97-6507, 99-2638,

8

1999 WL 852831, at *6 (Mass. Super. Sept. 17, 1999) (noting that "not every fear . . .will suffice; the fear involved must arise from 'pressures applied unlawfully or wrongfully'" (quoting Int'l Underwater Contractors, Inc., 8 Mass. App. Ct. 340, 342 (1979))). Likewise, Ejaz admitted at his deposition that none of what Bose's counsel said to him was false. See Ejaz Dep., D. 38-2 at 43:15–45:20. Accordingly, whatever pressure Ejaz may have felt from Bose's counsel's truthful statements could not support a claim of duress. See Nygren, 1999 WL 852831, at *6 (concluding that "[n]either threats to take actions that are not wrongful or unlawful, nor such actions themselves, constitute duress"). The only statement identified by Ejaz that was arguably wrongful was Bose's counsel's alleged advice that, if he were in Ejaz's position, he would sign the Settlement Agreement. Ejaz Aff., D. 43-2 at ¶ 13. However, there is no evidence that this statement "deprived [Ejaz] of his free or unfettered will." See Happ v. Corning Inc., No. 03-11258-GAO, 2005 WL 3704889, at *3 (D. Mass. Nov. 28, 2005) (noting that "the law draws a distinction between a hard choice and no choice at all; only the latter serves to support a finding of duress"), aff'd, 466 F.3d 41 (1st Cir. 2006). Ejaz later received the proposed agreement, "tried [his] best" to review it himself, reviewed it with his wife (who also advised him to sign it) and returned it to Bose. Ejaz Dep., D. 38-2 at 78:10–79:6. Even if the Court credits Ejaz's assertion that this arguably wrongful statement deprived him of his free will, he has failed to establish that the statement compelled him to accept a disproportionate exchange of values. As discussed above, the Settlement Agreement did not involve a disproportionate exchange of values. Finally, the fact that Ejaz may have felt economic pressure from the prospect of a lawsuit does not establish that Bose subjected him to duress. Happ, 2005 WL 3704889, at *2 (concluding that "[e]conomic duress does not exist where one contracting party simply takes advantage of another's financial difficulty or necessity. . . . it exists only if the

alleged wrongdoer's acts can be show to have <u>caused</u> the financial difficulty that it then takes

advantage of"). Therefore, Ejaz's duress argument must also fail.

Accordingly, the Settlement Agreement is enforceable and requires that Ejaz must abstain

from selling Bose products in the United States or abroad without obtaining the express written

consent of Bose. D. 38-2 at 60. Here, Ejaz breached the Settlement Agreement at least seven times.[1]

In an email to the owner of the website www.tabberone.com dated April 9, 2011, Ejaz wrote:

> I have . . . sold 7 systems in Australia since 2007. . . .Yes I admit it is my mistake
> that [I] should have NEVER sold a single Bose product, but I was under the
> impression that they have barred me from selling Bose in US and EU. But now I
> have read the agreement that I signed, it clearly stated US and abroad.

Ejaz Dep. Ex. 20, D. 38-2 at 157. The owner replied to this email and asked Ejaz, "If your

agreement said not to do it, why did you do it?" to which Ejaz responded, "It is my fault and I guess

greed got [the] better of me." <u>Id.</u> at 156. Ejaz testified that he did not ask Bose for consent to sell

the Bose systems in Australia. Ejaz Dep., D. 38-2 at 65:17–66:2. Pursuant to the liquidated

damages provision of the Settlement Agreement, Ejaz must pay Bose "[]$50,000[] for each product

in each instance of unauthorized use" for a total of $350,000. D. 38-2 at 63.

Ejaz, however, contends that the liquidated damages provision is unenforceable. Def. Opp.,

D. 43 at 17–20. Under the Restatement of Contracts (which is employed by Massachusetts courts):

> Damages for breach by either party may be liquidated in the agreement but only at
> an amount that is reasonable in the light of the anticipated or actual loss caused by
> the breach and the difficulties of proof of loss. A term fixing unreasonably large
> liquidated damages is unenforceable on grounds of public policy.

---

[1] Bose suggests that Ejaz likely sold far more than seven Bose Lifestyle Systems in violation of the Settlement Agreement because he posted as many as twenty-eight eBay listings advertising Bose products and also sold Bose products via his own website. Pl. Mot., D. 37 at 9 n.2. However, for purposes of this dispute, Bose has opted to rely upon Ejaz's admission that he sold seven systems in Australia.

RESTATEMENT (SECOND) OF CONTRACTS § 356(1) (1979). "Two factors combine to determine whether an amount fixed as liquidated damages is not so unreasonably large as to be unenforceable. First, to be reasonable the amount must approximate actual loss or loss anticipated at the time the contract was executed." Space Master Int'l, Inc. v. City of Worcester, 940 F.2d 16, 17 (1st Cir. 1991); see TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006). Second, "[t]he greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty . . . the easier it is to show that the amount fixed is reasonable." Space Master Int'l, Inc., 940 F.2d at 17–18 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b). Ejaz bears the burden of showing that the liquidated damages provision in the Settlement Agreement is unenforceable. NPS, LLC v. Minihane, 451 Mass. 417, 420 (2008). Moreover, the Court evaluates the reasonableness of the clause using all the information known "at the time the agreement was made." TAL Fin. Corp., 446 Mass. at 431–432 (noting that a "liquidated damages provisions will be enforced when, at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach").

Ejaz has not met that burden. Indeed, Ejaz misapplies the burden and argues that "Bose has presented no evidence that the parties['] anticipated damages would be difficult to ascertain," and that "Bose has provided no evidence of actual loss." Def. Opp., D. 43 at 19, 20. Ejaz's only affirmative argument is that the damage award of $50,000 per sale is grossly disproportionate to the gross revenues that Ejaz realized from the seven sales in Australia and thus to the actual damages Bose would incur from such sales. Id. at 19. This argument fails to recognize that the loss at issue is not only the anticipated lost sales if an Australian consumer buys Bose products from Ejaz instead

of Bose, but also includes the anticipated losses associated with potential trademark infringement and dilution and, as Bose's 30(b)(6) witness testified, "damage [to] Bose's brand image," which is Bose's "most important asset." Bose Dep., D. 38-6 at 128:2–3, 50:7–8. Establishing the amount of losses from trademark infringement is difficult. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir. 1992) (noting that "[b]y its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated").[2] The anticipated damages at the time of the Settlement Agreement also included the costs associated with enforcing the agreement, which could be difficult to calculate and costly given Bose's previous interactions with Ejaz. In a 2005 email exchange with Bose, Ejaz threatened to hide behind the anonymous nature of his online sales, "I WILL sell Bose, and I will welcome you to sue my phony address with e[B]ay, the only way for you to catch me would be coming at the mailbox place to arrest me, from where I sell my units." Ejaz Dep. Ex. 7, D. 38-2 at 81. In 2006, when Ejaz was approached by Bose's counsel about his sales of Bose products into the United Kingdom, Ejaz told Bose's counsel that he would "run away from the country if [Bose] came after [him] for any money." Ejaz Dep., D. 38-2 at 42:3–4. That is, Bose may have faced considerable costs in enforcing the agreement. In light of the foregoing, the Court cannot conclude that the

---

[2] Bose also contends that the scale of its damages is illustrated by Ejaz's initial disclosures, which, as Bose reads them, assert that Ejaz lost $50,000 in profits from a four-week interruption in his ability to resell Bose products. Pl. Mot., D. 37 at 10. Ejaz retorts that the $50,000 figure reflects the profits he lost from abstaining from selling Bose products over the five year period following the Settlement Agreement. Def. Opp., D. 43 at 19. In light of the parties' dispute about the scope of Ejaz's lost profits, the Court has not relied upon these statements. Moreover, the critical inquiry regarding the reasonableness of the liquidated damages is whether it was a reasonable forecast of damages, including difficult to ascertain damages to Bose. For the reasons stated above, the Court concludes that it is reasonable.

damages as provided in the liquidated damages provision are unreasonable. Therefore, the liquidated

damages provision is enforceable and Bose is entitled to a damages award of $350,000.[3]

## B. Trademark Infringement Under Common Law and Federal Law (Count II)

Bose moves for summary judgment on its trademark infringement claims under both

common law and federal law. "Claims for infringement of a registered trademark are governed by

§ 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)," Bos. Athletic Ass'n, 867 F.2d at 28, which states

in relevant part:

> Any person who shall, without the consent of the registrant—
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a
> registered mark in connection with the sale, offering for sale, distribution, or
> advertising of any goods or services on or in connection with which such use is
> likely to cause confusion or to cause mistake, or to deceive;
>
> . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). To establish trademark infringement under both the Lanham Act and common

law,[4] Bose must establish "(1) that its mark is entitled to trademark protection, and (2) that the

---

[3] Under the Settlement Agreement, the liquidated damages provision is also triggered by
non-compliance with a requirement that Ejaz provide certain documents and information
regarding his purchase of Bose products to Bose and cooperate in any legal proceedings Bose
may bring against any other parties in connection with the claims Bose released in the Settlement
Agreement. Ejaz argues that the liquidated damages provision would be unenforceable in these
contexts as well. Because Bose only seeks to enforce the liquidated damages provision in
relation to Ejaz's sale of Bose products in Australia, the Court need not address the issue in the
context of other possible breaches of the Settlement Agreement.

[4] Although Bose asserts trademark infringement claims under both federal law (in the
form of the Lanham Act) and "common law," Bose does not specify which state's law governs
its non-federal trademark claims. To resolve this question, the Court applies Massachusetts's
choice-of-law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941).
Massachusetts employs a "functional approach" incorporating the "useful guidance" of the
RESTATEMENT (SECOND) OF CONFLICT OF LAWS. Lou v. Otis Elevator Co., 77 Mass. App. Ct.
571, 583 (2010). In cases involving torts — which include trademark infringement, see Kelley

allegedly infringing use is likely to cause consumer confusion." <u>Bos. Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d 1, 12 (1st Cir. 2008). "[A] showing of actual confusion is not required." <u>Nestle</u>, 982 F.2d at 640. Registration of a trademark on the Principal Register of the United States Patent and Trademark Office is prima facie evidence that the mark is entitled to trademark protection. <u>Nat'l Nonwovens, Inc. v. Consumer Prods. Enters., Inc.</u>, 397 F. Supp. 2d 245, 251 (D. Mass. 2005). The BOSE® and LIFESTYLE® trademarks are registered on the Principal Register, Bose's Registration Certificates, D. 38-1, and Ejaz has not presented any evidence of invalidity to rebut the presumption. <u>See</u> <u>Nat'l Nonwovens</u>, 397 F. Supp. 2d at 252. Ejaz, however, does dispute whether his conduct was likely to cause consumer confusion.

In a case involving gray market goods, that is, involving the import, without consent, of a trademark holder's product into a country where the holder sells a different version of the product bearing the same mark, "a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law." <u>Nestle</u>, 982 F.2d at 640. "[T]erritorial protection kicks in under the Lanham Act where two merchants sell physically different products in the same market and under the same name, for it is this prototype that impinges on a trademark holder's goodwill and threatens to deceive consumers."

---

v. CVS Pharmacy, Inc., No. 98-0897-BLS2, 2007 WL 2781163, at *13 (Mass. Super. Ct. Aug. 24, 2007) — this test focuses on the locus of: the parties, their relationship and the conduct and injury at issue. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145. Under these factors, the only plausible candidates are Massachusetts and New Jersey, which are each home to a party. However, in both Massachusetts and New Jersey, the test for common law trademark infringement is the same as under the Lanham Act. <u>See</u> <u>Black Dog Tavern Co., Inc. v. Hall</u>, 823 F. Supp. 48, 53–54 (D. Mass. 1993); <u>Barre-Nat'l, Inc. v. Barr Labs., Inc.</u>, 773 F. Supp. 735, 746 (D.N.J. 1991). Because the two states' laws are not materially different, the Court need not determine which applies, <u>Lexington Ins. Co. v. Gen. Acc. Ins. Co. of Am.</u>, 338 F.3d 42, 46 (1st Cir. 2003), especially given that both tests are identical to the federal infringement test that it applies here.

Id. at 637 (internal citation omitted).  Therefore, the issue here is whether the goods that Bose manufactures for sale in the United States, which Ejaz sold in Australia, are "materially different" from the goods that Bose manufactures for sale in Australia.  The standard for materiality in this context is "always  quite low in such cases."  Id. at 641.

> A reviewing court must necessarily be concerned with subtle difference, for it is by subtle differences that consumers are most easily confused.  For that reason, the threshold of materiality must be kept low enough to take account of potentially confusing differences — differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations.

Id. at 641.  The First Circuit has "conclude[d] that the existence of any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade-Mark Act claim."  Id.

There is undisputed evidence that there are numerous differences between Bose Lifestyle Systems intended for resale in the United States and those intended for resale in Australia, and that such differences affect the performances of those systems in each market.  First, for the systems that contain DVD players, there are differences in DVD region coding between the United States and Australia whereby a DVD player with a U.S. region code cannot play Australian DVDs, which have a different region code.  Answer, D. 19 at ¶ 10, Bose Dep., D. 38-6 at 117:18–20, 27:5–9.  Second, there are differences in electrical voltage systems such that the Bose Lifestyle Systems sold in the United States "would not be packaged with the correct electrical cord to plug into an Australian electrical outlet."  Bose Dep., D. 38-6 at 117:5–8.  Third, the remote controls for systems made for the American and Australian markets have different functionality and capabilities such that remote controls manufactured for the Australian market are capable of displaying characters that the

American equivalents are not capable of displaying. Id. at 88:17–89:5. Fourth, American systems have a one-year warranty, whereas Australian systems have a two-year warranty. Id. at 94:3–4. Fifth, the radio tuner in the U.S. models would have to be modified to work in Australia. Id. at 116:22–117:4. This difference in radio tuners would lead the U.S. system to "not apply the correct signal processing to eliminate noise on certain FM radio stations" in Australia, a problem called "FM de-emphasis," and would result in "inferior audio quality when listening to the radio." Id. at 119:7–120:2.

The Court concludes that each of these differences between the U.S.-market and Australian-market Bose systems constitutes a material difference that creates a presumption of consumer confusion. To begin with, other courts have held that differences in warranty coverage are material. See, e.g., Dan-Foam A/S v. Brand Named Beds, LLC, 500 F. Supp. 2d 296, 314 (S.D.N.Y. 2007); see also Nestle, 982 F.2d at 639 n.7 (noting that "differences in, say, warranty protection or service commitments . . . may well render products non-identical in the relevant Lanham Trade-Mark Act sense"). Further, the differences in DVD coding, remote-control function, voltage and FM radio signal processing all bear directly on the capabilities and performance of these high-end audio systems. Under the governing standard, which imposes a "threshold of materiality . . . low enough to take account of potentially confusing differences," Nestle, 982 F.2d at 641, these potentially subtle but certainly non-trivial differences are material and thus trigger the presumption of consumer confusion.

Ejaz contends, however, that his conduct did not create consumer confusion, notwithstanding the presence of material differences, because his Australian customers were aware that the systems he was selling were intended for other markets. Ejaz bases this argument on the fact that some

16

customers supposedly inquired about the systems' region coding.  See Def. Opp., D. 43 at 12.  But

the record does not support this suggestion; he cites a paragraph of his statement of disputed facts

("SDF") that actually says merely that information on region coding is available on the internet.  See

Def. SDF, D. 43-1 at ¶ 32.  In any event, the possibility that some customers were savvy enough to

ask about the region coding does not establish that the region coding and other foreign-market

differences were apparent to all of Ejaz's customers.  On the contrary, the eBay listings themselves

describe each unit as "the _exact_ same unit you would buy from Bose."  Ejaz Dep. Exs. 16, 17, 18,

19, D. 38-2 at 130, 134, 138, 142.  This description, in combination with some units' listing on

eBay.com.au, the Australian eBay site, and the notation that the units were located in Melbourne,

Australia, Ejaz Dep. Exs.16, 17, 18, 19, D. 38-2 at 129, 133, 137, 140, was likely to exacerbate,

rather than alleviate, the consumer confusion that would result from the market differences discussed

above.  And, to the extent that Ejaz relies on the statement in his affidavit that "[c]ustomers who

purchased these units in Australia were aware that they would not play Australian DVDs without

a change in region code," Ejaz Aff., D. 43-2 at ¶ 26, that statement is insufficient to stave off

summary judgment.  First, it is conclusory.  See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896

F.2d 5, 8 (1st Cir. 1990) (explaining that "summary judgment may be appropriate if the nonmoving

party rests merely upon conclusory allegations, improbable inferences, and unsupported

speculation").  Second, it does nothing to address the likely consumer confusion that would result

from the other material differences discussed above, including the remote-control and sound-quality

issues.  Accordingly, Ejaz has pointed to no evidence to rebut the presumption of consumer

confusion created by all of the material differences between Australian-market and U.S.-market

systems.  Accordingly, there is a likelihood of consumer confusion and Bose's motion for summary

judgment as to Count II is GRANTED.

### C.     Dilution (Count III)

Bose also asserts another trademark claim for "violation of Bose's common law and federal trademark rights," and "unlawful dilution of Bose's marks pursuant to [the Lanham Act,] 15 USC § 1125(c)" (Count III) and seeks summary judgment on "all trademark claims." However, it has not argued that Ejaz's conduct constitutes dilution under 15 U.S.C. § 1125(c), which provides in relevant part:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Id. § 1125(c)(1). A mark is "famous" when it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." Id. § 1125(c)(2)(A). There are two types of dilution: dilution by blurring and dilution by tarnishment. Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 264 (4th Cir. 2007). "Dilution by blurring" is "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). "Dilution by tarnishment" is "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." Id. § 1125(c)(2)(C). Thus, to make a dilution claim, Bose must show:

> (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous

mark.

Louis Vuitton, 507 F.3d at 264–65.

Although it is true that, in the gray goods context, dilution by tarnishment often goes hand in hand with trademark infringement, see Dan-Foam, 500 F. Supp. 2d at 312, Bose has failed to establish the first element, that its marks are "famous." Although Bose's statement of facts asserts without elaboration that Bose's marks are "famous," see Pl. SOF, D. 38 at ¶ 3, whether a mark is "famous" under the Lanham Act is a question of law that the Court must resolve on the basis of "all relevant factors," including: "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties"; "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; "[t]he extent of actual recognition of the mark"; and "[w]hether the mark was registered under the Act of March 3, 1881, or the Act of Federal 20, 1905, or the principal register." 15 U.S.C. § 1125(c)(2)(A); see Lyons v. Gillette, No. 11-12192-WGY, 2012 WL 3090043, at *7 (D. Mass. July 31, 2012) (determining whether a mark is famous "as a matter of law"). Neither Bose's statement of facts nor its brief makes any effort to establish these factors, or to otherwise show a factual basis for the conclusion that Bose's marks are "widely recognized by the general consuming public of the United States." Accordingly, the Court cannot find, on the basis of Bose's bald assertion that its marks are famous, that the first element of trademark dilution has been satisfied here. Because Bose has failed to show that its marks are "famous" within the meaning of the Lanham Act, Bose's motion for summary judgment as to Count III is DENIED.

## VI.    Conclusion

For the foregoing reasons, Bose's motion for summary judgment is GRANTED as to Counts

I and II and DENIED as to Count III.

**So ordered.**

/s/ Denise J. Casper
United States District Judge